UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| AARON FROMER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) No. 1:13-cv-00220-JMS-DML |
| CORIZON, INC., NOE MARANDET, M.D., | ) |
| individually and in his official capacity as an | ) |
| employee of Defendant Corizon, Inc., NAVEEN | ) |
| RAJOLI, M.D., individually and in his official | ) |
| capacity as an employee of Defendant Corizon, | ) |
| Inc., MIAMI CORRECTIONAL FACILITY HEALTH | ) |
| SERVICES ADMINISTRATOR, individually and in | ) |
| his or her official capacity as an employee of | ) |
| Defendant Corizon, Inc., and PUTNAMVILLE | ) |
| CORRECTIONAL FACILITY HEALTH SERVICES | ) |
| ADMINISTRATOR, individually and in his or her | ) |
| official capacity as an employee of Defendant | ) |
| Corizon, Inc., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Presently pending before the Court is a Motion for Judgment on the Pleadings and/or Motion for Summary Judgment filed by Defendants Corizon, Inc. ("Corizon"), Dr. Noe Marandet, Dr. Naveen Rajoli, Miami Correctional Facility Health Services Administrator ("Miami HSA"), and Putnamville Correctional Facility Health Services Administrator ("Putnamville HSA"). [Filing No. 87.]

## I.
### STANDARD OF REVIEW

Defendants' motion is for judgment on the pleadings or for summary judgment. [Filing No. 87.] In ruling on a motion for judgment on the pleadings, the Court may only consider the complaint, answer, and any documents attached thereto as exhibits. *See N. Ind. Gun & Outdoor*

*Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452-53 (7th Cir. 1998). Defendants rely on matters outside of the pleadings for all of their arguments.[1] Accordingly, the Court will treat Defendants' motion for judgment on the pleadings as one for summary judgment, and apply that standard. *See U.S. v. $183,026.36 in U.S. Currency*, 2014 WL 3734172, *5 (N.D. Ind. 2014) ("Federal Rule of Civil Procedure 12(d) requires the Court to convert a motion for judgment on the pleadings to a motion for summary judgment when matters outside the pleadings are presented and not excluded by the Court").

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R.

---

[1] While Defendants do not delineate which arguments are made in connection with which type of motion, the Court assumes they seek dismissal based on a failure to exhaust administrative remedies and on the claims against the Health Service Administrators for failing to identify those individuals. But these arguments are treated more appropriately as summary judgment arguments. Specifically, Defendants rely on Mr. Fromer's grievances, which are not part of the pleadings, in connection with their failure to exhaust administrative remedies argument. As for Defendants' argument relating to Mr. Fromer's failure to name the individual Health Service Administrators, the Court treats the claims against those individuals as claims against Corizon, as discussed below. Defendants rely on matters outside the pleadings in connection with Mr. Fromer's claims against Corizon, so application of the summary judgment standard is warranted.

Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the

existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The Court notes at the outset that Mr. Fromer has not complied with Local Rule 56-1(b), which provides that a response to a motion for summary judgment "must include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." While Mr. Fromer includes a section titled "Statement Of Material Facts In Dispute," [Filing No. 107 at 8], he does not specifically identify facts that he is disputing. Instead, he provides his version of events, but without tying it to alleged inaccuracies in Defendants' Statement of Material Facts Not in Dispute. This approach does not comply with Local Rule 56-1(b), and has made review of Defendants' motion unnecessarily cumbersome.

Nevertheless, the Court has attempted to sift through Mr. Fromer's version of events, determine which facts set forth by Defendants he disputes, and construe disputed facts in his favor when he has provided citations to evidence in the record. But failure to comply with Local Rule 56-1(b) can result in a concession of the movant's version of events. *See, e.g.*, *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (the Seventh Circuit has "repeatedly upheld the strict enforcement of these rules, sustaining the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts").

The Court also notes that Mr. Fromer's Statement of Material Facts In Dispute contains a great deal of legal argument, purportedly supported by Mr. Fromer's expert's report. [*See, e.g.*, Filing No. 107 at 8-9 ("A patient presenting with evidence of a MRSA infection should have a

culture with sensitivity testing if there is a site to culture" and "[r]epeating cultures can indicate if treatment failure is due to re-infection with a different organism or relapse with the same organism") (citing Filing No. 106-14).]  Consequently, the Court discusses Mr. Fromer's expert's opinion in its discussion of Mr. Fromer's claims.

The Court finds the following to be the undisputed facts, supported by admissible evidence in the record.

### A.  Corizon and Its Policies

Corizon is a for-profit corporation that entered into a Professional Services Contract (the "Contract") with the Indiana Department of Correction ("IDOC") to provide healthcare services to IDOC inmates.  [Filing No. 106-5 at 2.]  The Contract requires that Corizon provide, at a minimum, health and mental health services "in a manner set forth in the Technical Proposal from RFP 5-103, Department policies, procedures and directives, [certain] Performance Measures…, American Correctional Association ("ACA") and National Commission on Correctional Health Care ("NCCHC") standards, and consistent with correctional and community standards of care." [Filing No. 106-5 at 2.]   The Contract also provides that "[w]hen correctional or community standards of care are unclear, [Corizon and IDOC] shall adopt mutually agreed upon standards, treatment guidelines or protocols."  [Filing No. 106-5 at 2.]

The Performance Measures attached to the Contract provide guidelines for the treatment of certain conditions, including infectious diseases.  [Filing No. 106-6.]  Corizon does not have in its possession any NCCHC standards that it adheres to.  [Filing No. 106-11 at 2.][2]

---

[2] As for ACA standards, Mr. Fromer states "Corizon claims that it follows ACA standards; however,…the Defendant doctors were never provided with any ACA materials, which would seem to testify to the contrary."  [Filing No. 107 at 11.]  Like other statements in Mr. Fromer's Statement of Material Facts In Dispute, however, Mr. Fromer does not provide any citation to the record for his statement.  Local Rule 56-1(e) provides that "A party must support each fact the

**B. Initial Treatment of Rash**

Mr. Fromer was a prisoner of the Indiana Department of Correction at all times relevant to this matter, and was transferred to the Miami Correctional Facility ("MCF") on January 16, 2009. [Filing No. 90-1 at 2-5.] Mr. Fromer had the following initial encounters with healthcare professionals at MCF:

- 03/05/09: Mr. Fromer complained of a "rash between toes and groin." A nurse noted "[n]o evidence of infection," stated that it was related to "tinea (athlete's foot)," and gave Mr. Fromer an antifungal cream for treatment. [Filing No. 90-1 at 7.]

- 03/09/09: Mr. Fromer complained of athlete's foot, which he claimed had started twelve days before. A nurse noted that "offender has been using antifungal cream stated it is not helping stated groin is not better stated hydrocortisone made it a little better," and that "feet are cracking and peeling Grt toe is infected noted swelling and light brown drainage to side of left grt toe." Mr. Fromer was treated with Keflex.[3] [Filing No. 90-1 at 8.]

- 04/14/09: Mr. Fromer was seen by Dr. Joseph Thompson for a "rash on both feet and shoulders." Dr. Thompson noted "Pt has fungal infections to feet and

---

party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence. The evidence must be in the record or in an appendix to the brief. The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." L.R. 56-1(e); *see also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record…."). Indeed, the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Mr. Fromer's failure to comply with the Federal and Local Rules in his response brief has consequences. In deciding Defendants' Motion for Summary Judgment, the Court will only consider Mr. Fromer's factual assertions that are supported by citations to the record evidence that support the factual assertion in accordance with Federal Rule of Civil Procedure 56(c) and Local Rule 56-1(e). The factual background the Court has set forth reflects this approach.

[3] Keflex is a cephalosporin antibiotic used to treat bacterial infections, including skin infections. http://www.drugs.com/keflex.html (last visited October 1, 2014).

in groin area. Pt states the anti-fungal creams have not been working," and treated him with Diflucan.[4] [Filing No. 90-1 at 9.]

· 05/12/09: While examining Mr. Fromer in connection with a seizure he had, Dr. Joseph Thompson noted that Mr. Fromer "also has athletes foot, he has been using antifungal creams with no success. Will try [Dakin's] solution." Dr. Thompson noted Mr. Fromer's rash was "red, pruritic on the left feet and it is unchanged," and ordered him to soak his feet in Dakin's solution.[5] [Filing No. 90-1 at 10-11.]

· 10/25/10: Mr. Fromer was seen by a nurse who noted that he had a rash on his groin, that he had been treated previously for a rash, and that he stated he needed a refill of his cream medication. She gave him an antifungal cream to treat the rash. [Filing No. 90-1 at 12.]

### C. Mr. Fromer's Encounters With Dr. Marandet at MCF

Dr. Marandet was the Medical Director and a physician at MCF when he first examined

Mr. Fromer, until Mr. Fromer's eventual transfer. [Filing No. 90-2 at 3.]

· 03/24/11: Mr. Fromer was seen by Dr. Marandet for "surinfected athlete[']s foot uncontrolled with antifunga." Dr. Marandet noted "Dakin['] solution was effective in the past," and again gave Mr. Fromer Dakin's solution. [Filing No. 90-1 at 16.] This was Dr. Marandet's first encounter with Mr. Fromer relating to his foot issues.

· 05/23/11: Dr. Marandet noted that Mr. Fromer's right foot "looks much better with oral antibiotic,"[6] and prescribed a topical cream. [Filing No. 90-1 at 18.]

---

[4] Diflucan is an antifungal medicine used to treat infections caused by fungus "which can invade any part of the body including the mouth, throat, esophagus, lungs, bladder, genital area, and the blood." http://www.drugs.com/diflucan.html (last visited October 1, 2014).

[5] "Dakin's solution is used to prevent and treat skin and tissue infections that could result from cuts, scrapes and pressure sores. It is also used before and after surgery to prevent surgical wound infections. Dakin's solution is a type of hypochlorite solution. It is made from bleach that has been diluted and treated to decrease irritation. Chlorine, the active ingredient in Dakin's solution, is a strong antiseptic that kills most forms of bacteria and viruses." http://www.webmd.com/drugs/2/drug-62261/dakin's-misc/details (last visited October 1, 2014).

[6] On May 5, 2011, Mr. Fromer filed a Request for Health Care in which he complained that his "whole body is itching real bad," and he was prescribed Hydrocortisone. [Filing No. 90-1 at 17.] But the Court cannot discern from the medical records which healthcare provider saw Mr. Fromer on May 5, 2011 and prescribed Hydrocortisone, and the signature of the "Health Care staff" who completed the form is illegible. [Filing No. 90-1 at 17.]

- 06/20/11: Mr. Fromer submitted a Request for Healthcare in which he stated "the infection I have had in my feet are back and need to see Doctor. ASAP. Thank you." [Filing No. 90-1 at 20.]

- 06/24/11: Dr. Marandet noted that Mr. Fromer had recurrent dermatophytosis of the foot, and prescribed Dakin's solution and Bactrim DS.[7] [Filing No. 90-1 at 21.]

- 08/08/11: Mr. Fromer saw Dr. Marandet for "surinfected tinea pedia." Dr. Marandet noted he would "put him on diflucan for 1 month," and prescribed Diflucan for one month, Dakin's solution for two months, Bactrim DS for ten days, Lidex[8] for three months, and Naprosyn[9] for two months. [Filing No. 90-1 at 23.]

- 09/12/11: Dr. Marandet again prescribed Diflucan for Mr. Fromer. [Filing No. 90-1 at 24.]

- 09/22/11: Mr. Fromer completed a Request for Health Care, in which he stated "I have written a complaint many times for my foot problem. The medicine you have given me is not working at all and my feet are in tremendous pain. I would really like to know if there is any meds you can give me for the pain. This situation is making me crazy. Please help me to take care of this problem. Thank you." [Filing No. 90-1 at 25.]

- 10/04/11: Dr. Marandet examined Mr. Fromer during a scheduled visit, and Dr. Marandet noted that Mr. Fromer had an "[i]ngrowing nail…infected," prescribed Keflex, and stated "Please schedule for removal of toenails." [Filing No. 90-1 at 26.]

- 10/25/11: Dr. Marandet examined Mr. Fromer again, stating that Mr. Fromer "has bilateral infected ingrown toenails and severe tinea pedia. Will schedule for ablation of nails after infection resolves." [Filing No. 90-1 at 27.]

---

[7] Bactrim DS is a combination antibiotic consisting of Sulfamethoxazole and Trimethoprim, which are used to treat certain bacterial infections. http://www.drugs.com/mtm/bactrim-ds.html (last visited October 1, 2014).

[8] Lidex is a topical adrenocortical steroid used to reduce skin inflammation. http://www.drugs.com/cdi/lidex-cream.html (last visited October 1, 2014).

[9] Naprosyn is a nonsteroidal anti-inflammatory drug used to treat pain or inflammation. http://www.drugs.com/naprosyn.html (last visited October 1, 2014).

- 12/04/11: Mr. Fromer was seen for itching and pain in his left foot. A nurse stated "Offender seen in triage this am – on his (L) foot great toe and third toe, currently has ingrown toenails on both toes, and appears to be infected. He stated he was coming down for foot soaks but stopped. His treatment card for foot soaks is good until 1/25/12. Keflex given per protocol, explained he needed to start coming for those foot soaks and he would notice a difference. Educated and verbalized understanding." [Filing No. 90-1 at 29.]

- 12/30/11: Mr. Fromer saw Dr. Marandet during a scheduled visit. Dr. Marandet noted "[h]e has recurrent infection of big toe from ingrowing toenail. Keflex has worked well in the past." Dr. Marandet did not prescribe any additional medications, but continued Keflex, Naprosyn, and Lidex. [Filing No. 90-1 at 30.]

- 03/01/12: A nurse saw Mr. Fromer and noted that he "want[ed] Keflex." She also noted "offender stated he has pus that comes out of the side of his toes," and herself noted "several small round areas to legs feet and hands no drainage noted at this time." The nurse instructed Mr. Fromer to continue taking his current medication, and not to stop taking his medication even when the symptoms resolved. Dr. Marandet approved the nurse's instructions. [Filing No. 90-1 at 31-32.]

- 03/15/12: Mr. Fromer completed another Request for Health Care, in which he stated "[m]y toe is infected real bad! And it keeps on leaking a clear liquid and It[']s very painful. It looks like its been burned up. Could you please see me A.S.A.P." [Filing No. 90-1 at 33.]

- 03/17/12: A nurse saw Mr. Fromer, and stated "Patient[']s left toe beside little toe on anterior side is draining clear discharge, the whole anterior part of toe has no skin, is red, bloody. Patient also has dried scab on left lateral ankle. Patient has several reddened areas that are not open and draining in sparatical parts of anterior foot, varying in size and shape. Will refer to MD Sick Call, this is not responding to protocol medications. Toe was cleaned with Normal saline and TAO and dry dressing applied. Patient educated on hygiene." [Filing No. 90-1 at 34.]

- 03/27/12: Dr. Marandet saw Mr. Fromer for "recurrent tinea pedis," and prescribed Mycostatin powder.[10] [Filing No. 90-1 at 35-36.]

- 04/21/12: A nurse saw Mr. Fromer and noted "[p]atient presenting with chief complaint(s) of…feet are hurting and increased redness. Patient has had feet problems for the last 14 months. Patient stated powder has worked the best and

---

[10] Mycostatin powder is also called Nystatin, and is used to treat certain types of fungus infections of the skin. http://www.drugs.com/cons/mycostatin-powder-topical.html (last visited October 1, 2014).

keeps feet comfortable. Patient has redness to the corner of toes. Patient is on Bactrim. Patient is on Nystatin. Patient referred to the provider for evaluation and treatment." An examination revealed "erythemic area with short well defined slightly raised border," and "increased redness, drainage, increased pain." The nurse ordered Mr. Fromer be "referred to provider" because "condition not responding to protocol" and since there were "signs of infection." Dr. Marandet approved the nurse's orders. [Filing No. 90-1 at 37-38.]

· 05/17/12: Mr. Fromer saw a nurse, who noted that he had ingrown toenails and that there were signs and symptoms of infection including "increased warmth, increased redness, increased swelling, drainage, [and] increased pain." She ordered Keflex. [Filing No. 90-1 at 39.]

· 05/31/12: Dr. Gregory Haynes saw Mr. Fromer during a scheduled visit, and noted "Patient states that the right large toe is better with the anti-biotics. No drainage. Noted discomfort. Exam: Right large toe – mild erythema without drainage. Tender with pressure. Plan: 1) if drainage occurs again, come to medical for culture. 2) x-ray of right large toe. 3) continue with the anti-biotics until done." [Filing No. 90-1 at 40.]

· 06/06/12: An x-ray of Mr. Fromer's right great toe revealed no abnormalities. [Filing No. 90-1 at 45.]

· 06/10/12: Mr. Fromer completed a Request for Health Care, in which he stated "The Dr. told me when the puss started to come out of my toe again. That he wanted me to come in and get a Bio. of the puss. It was order[ed] by the Dr. Thank you." [Filing No. 90-1 at 46.]

· 06/15/12: The report from a culture of discharge from Mr. Fromer's right great toe, ordered by Dr. Marandet, revealed "heavy growth of Methicillin Resistant Staph Aureus."[11] [Filing No. 90-1 at 47.] The culture report indicated that the infection was sensitive to "Trimethoprim/Sul," which is also known, among other names, as Bactrim DS.[12] Dr. Marandet prescribed Bactrim DS the same day. [Filing No. 90-1 at 49.] This was Dr. Marandet's last contact with Mr. Fromer, as Mr. Fromer was transferred to the Putnamville Correctional Facility ("PCF") on June 19, 2012. [Filing No. 90-2 at 5.]

---

[11] Methicillin Resistant Staph Aureus ("MRSA") is a bacterial infection that is resistant to many antibiotics. http://www.cdc.gov.mrsa (last visited October 2, 2014).

[12] http://www.mayoclinic.org/drugs-supplements/sulfamethox (last visited October 2, 2014).

**D. Mr. Fromer's Encounters With Dr. Rajoli at PCF**

When Mr. Fromer reached PCF on June 19, 2012, he was given a 9-day supply of Bactrim DS as Dr. Marandet had prescribed. [Filing No. 90-1 at 51.] Less than two months later, Mr. Fromer began complaining of discharge from his middle toe, [Filing No. 90-1 at 61], which resulted in numerous trips to the medical care facility at PCF and a handful of encounters with Dr. Rajoli, who was the Medical Director and a medical service provider physician at PCF at that time.

- 08/03/12: Mr. Fromer completed a Request for Health Care in which he stated "I have [MRSA] running out of my middle toe it will move to the other toes soon It is very painful to walk or even just sit for to[o] long at a time." [Filing No. 90-1 at 61.]

- 08/05/12: Mr. Fromer was seen by a nurse who stated "treatment in past with different antibiotics for mrsa, cont to recur in different spots, has showed up this time in third toe on right foot, pt tender to touch, atb ointment given and ibuprofen for pain and edema, with instructions and pt verbalized understanding at this time." The nurse noted that there were signs and symptoms of infection, including "increased warmth, drainage, [and] increased pain." [Filing No. 90-1 at 62.]

- 08/08/12: Mr. Fromer saw a nurse practitioner, and stated that his "symptoms are fairly controlled," but she noted that he was "here for reoccurring MRSA in toes around nails [and n]ow has area on 4th toe of r foot." She prescribed Naprosyn. [Filing No. 90-1 at 63-64.]

- 08/17/12: Mr. Fromer completed a Request for Health Care which stated "[t]he medication you gave me did not work. Please give me something els[e] to take I still have this problem with my toes leaking [MRSA] by my toe nail. Bactrim 800-180 mg no good…." Health Care staff noted that this was an "[o]ngoing issue for 18 months," and referred the request to a provider. [Filing No. 90-1 at 65.]

- 08/19/12: Mr. Fromer was seen by a member of the nursing staff for "drainage from toe." She noted "[h]as been on Keflex, Bactrim DS, and Doxycycline over a course of 18 months. 'Drainage will stop for a week or two but always comes back.' Had lab test of toes for MRSA and positive months ago. 'I just don't want to lose my toe over this.'" The nurse noted "[r]ight great toe is red, swollen, and noted dried yellowish drainage on sock. Painful to light touch and with boots taken on and off." She referred him to a provider due to signs of infection. [Filing No. 90-1 at 66-67.]

- 08/22/12: Mr. Fromer saw a nurse practitioner during a scheduled visit, who noted "He states the symptoms are fairly controlled. [C]omplains of chronic exudate from toes, none today. He does have ingrown toenail on r great toe. Will start doxycycline for MRSA which is what the exudate cultured out to….Will do foot soaks for 10 days and then Dr. Rajoli can put out ingrown toenail." [Filing No. 90-1 at 68.]

- 09/17/12: A member of the nursing staff saw Mr. Fromer for "toenail/foot pain – rash." The nurse noted that Mr. Fromer was "agitated," stated that he was "sick of no one doing anything about his pain," has "pins and needles" in his foot after working or while trying to fall asleep, and believes it is a sequel to his prior MRSA infection. The nurse noted that the exam was "fairly benign," and that the "R great toe has minimal redness at borders. Tender to touch." Mr. Fromer reported that he did not soak his feet for ten days, as he was instructed to do, because it was making the pain worse. He asked to be put back on Naprosyn, but was given Ibuprofen and a re-assessment was scheduled. [Filing No. 90-1 at 70.]

- 09/21/12: Mr. Fromer was examined by Dr. Rajoli for the first time. Dr. Rajoli explained the procedure to remove Mr. Fromer's ingrown toenail, but Mr. Fromer said that his symptoms have improved while on antibiotics, and refused the procedure. [Filing No. 90-1 at 72-75.]

- 09/28/12: Mr. Fromer completed a Request for Health Care in which he stated "the [MRSA] is back in my toes in my left foot and I[']m in a lot of pain." [Filing No. 90-1 at 76.]

- 10/02/12: A licensed practical nurse examined Mr. Fromer when he came in for "mrsa on toe." She observed "superficial injury to skin" and "[n]o evidence of infection," and gave him a topical antifungal cream to use for three days. [Filing No. 90-1 at 77.]

- 10/19/12: Mr. Fromer submitted another Request for Health Care which stated "my feet and toes hurt bad all the time will you see me." [Filing No. 90-1 at 78.]

- 10/23/12: A nurse practitioner examined Mr. Fromer and noted "He states the symptoms are poorly controlled. Patient with lesion on toes and legs, he is always digging at them and has oozing at times. [S]triation on toenail noted. [H]as raised red patches, swelling joints, stiffness, swelling of toes and typically look like sausages. He is complaining of intense pain in toes. Have drawn ana and sed rate and done biopsy of lesions." After discussing the plan with Dr. Rajoli, Mr. Fromer was scheduled for a "punch biopsy of his left foot" two days later. [Filing No. 90-1 at 79-81.]

- 10/25/12: Mr. Fromer presented for a punch biopsy of his foot, but Dr. Rajoli determined that "the foot condition healed to the extent there was nothing to perform a biopsy of." Instead, a swab of the foot area was taken and cultured and Dr. Rajoli "planned that if the culture returned positive with MRSA, then [he] would order antibiotics under controlled settings for the duration of treatment to assess compliance." [Filing No. 90-1 at 82; Filing No. 90-3 at 4.]

- 10/28/12: The report of the culture indicated that it tested negative for MRSA, but positive for a staph infection. [Filing No. 90-1 at 83.]

- 10/29/12: Dr. Rajoli met with Mr. Fromer and explained the culture results. He noted "Culture is positive for staph but it is sensitive to amoxicillin/clavulinic acid. Patient has been on bactrim and doxycycline several times – to which this bacteria is sensitive. Compliance with meds has been an issue so will place him on bactrim and provide it DOT twice daily." Dr. Rajoli also prescribed a topical cream. [Filing No. 90-1 at 84-86.]

- 11/22/12: Mr. Fromer was seen by nursing staff for "feet pain." Mr. Fromer told the nurse that he has "tried naproxen…and Tylenol and ibuprofen with no relief." [Filing No. 90-1 at 87.]

- 11/27/12: A "sick call" appointment was scheduled for this day based on Mr. Fromer's trip to see the nursing staff for foot pain, but Mr. Fromer did not show up. [Filing No. 90-1 at 89.]

- 11/30/12: Dr. Rajoli examined Mr. Fromer during a sick call appointment for pain while walking that was noted to be plantar fasciitis. Dr. Rajoli noted no joint deformity, heat, swelling, erythema or effusion in the right or left feet/ankles." Dr. Rajoli diagnosed Mr. Fromer with a foot sprain which was improved, and prescribed Naprosyn. [Filing No. 90-1 at 91-93.]

- 12/02/12: Mr. Fromer completed a Request for Health Care in which he stated "I have a blister on my middle finger of the left hand. I had drained it once. It has filled back up and is very painful. They are the same blisters I get on my feet, which you are calling [staph] or [MRSA] infection. I need more medication." The request indicates that Mr. Fromer was prescribed Bacitracin twice daily. [Filing No. 90-1 at 94.]

- 12/21/12: Mr. Fromer was seen by Dr. Rajoli for an ingrown toenail. Dr. Rajoli offered to remove the toenail, but Mr. Fromer declined. Dr. Rajoli prescribed Bacitracin, along with the medications Mr. Fromer was already taking which included Bactrim DS. This was Mr. Fromer's last encounter with Dr. Rajoli related to his feet issues. Mr. Fromer was transferred to Edinburgh Correctional Facility ("JCU") on March 12, 2013. [Filing No. 90-1 at 96-101.]

### E.  Mr. Fromer's Treatment at JCU

Mr. Fromer sought out treatment at JCU only once, on April 1, 2013.  He saw nursing staff for "skin irritation on feet" and stated "I just got bigger boots.  I wear a 9 ½ and now I have a new 9 boot which is helping.  No current pain or out breaks.  I have had a lot of problems in the past." [Filing No. 90-1 at 103.]  The nurse examined his feet, heels, and toenails, and stated that there was "no redness or irritation, no drainage, no odor, afebrile.  It is unclear why this offender wanted seen.  States father sending in boots soon.  Currently has inserts in boots which he reports are helping as well.  Soak pan offered." [Filing No. 90-1 at 103-04.]

Mr. Fromer was transferred to Plainfield Correctional Facility ("IYC") on April 2, 2013. On April 11, 2013, Mr. Fromer presented to nursing staff for "'MRSA' Right Ankle."  The nurse noted "states has been on Keflex or Bactrim every 5 weeks or so to treat outbreaks of 'MRSA.' States this 'outbreak' has lasted 4 days thus far.  Offender is requesting IV antibiotics to 'once and for all stop' these 'outbreaks.'  Offender states that he frequently has pus draining from his finger and toe nails – NO SIGNS & NO EVIDENCE OF THOSE DURING PHYSICAL EXAM OF FEET & HANDS." [Filing No. 90-1 at 107.]  She further noted that examination showed "small scabs free of redness in surrounding areas, no drainage, no active bleeding," and "no evidence of infection." [Filing No. 90-1 at 108.]  The nurse offered Mr. Fromer hydrocortisone cream and antifungal cream, but he declined them stating that they do not offer relief and are not effective. [Filing No. 90-1 at 108.]  The nurse explained to Mr. Fromer that MRSA is not a virus that has recurring "outbreaks," and Mr. Fromer said sometimes the "outbreaks" are staph instead. [Filing No. 90-1 at 108.]  The nurse informed Mr. Fromer that MRSA is a form of a staph bacterial infection, and not a viral infection. [Filing No. 90-1 at 108.]

On May 1, 2013, Mr. Fromer complained to nursing staff at IYC of an "on-going MRSA infection." [Filing No. 90-1 at 109.] The nurse noted a "superficial injury to skin," and that there were signs and symptoms of infection including "increased redness [and] increased pain." [Filing No. 90-1 at 109.] He was prescribed Morgidox, an antibiotic. [Filing No. 90-1 at 110.] This is the last medical record that the parties have introduced into evidence which relates to Mr. Fromer's claims.

### F. Mr. Fromer's Grievances

Mr. Fromer filed two grievances with the Indiana Department of Corrections related to the treatment outlined above. First, Mr. Fromer filed Offender Grievance 73584 on October 15, 2012, which relates to treatment he received at MCF from March 2011 to June 2012. [Filing No. 90-4 at 11.] In Grievance 73584, Mr. Fromer complained about the medical treatment he received at MCF for his feet issues, including that the medications he was given did not help. [Filing No. 90-4 at 11.]

In response to Grievance 73584, Corizon's Director of Nursing provided Mr. Fromer with an October 30, 2012 letter stating "Between 3/21/11 and 6/11/12 you were seen 19 times by medical for this complaint. Multiple rounds of antibiotics were ordered along with foot soaks, which you were non-compliant with. A culture of the drainage from your toes resulted in MRSA....This is a bacteria that you will always have. It is difficult to treat, but appropriate antibiotics were ordered." [Filing No. 90-4 at 12.]

Mr. Fromer filed a Level 2 appeal related to Grievance 73584 on November 15, 2012, reiterating his complaints. [Filing No. 90-4 at 13.] Corizon responded on January 2, 2013, again stating that Mr. Fromer's medical care was appropriate. [Filing No. 90-4 at 10.]

On October 19, 2012, Mr. Fromer filed a second grievance, Grievance 73429, which related to an incident where he claimed that a nurse practitioner at PCF failed to inform him of the results of a prior biopsy performed at MCF and instead gave him new medication. [Filing No. 90-4 at 3.] Mr. Fromer claimed that a subsequent nurse practitioner he saw told him that she did not want to prescribe the medication to treat MRSA because it was expensive and she "did not want to spend the money on it." [Filing No. 90-4 at 3.] Corizon's Health Services Administrator responded to Mr. Fromer's grievance on October 18, 2012, stating that Mr. Fromer was non-compliant and missed appointments to have his dressings changed, reported that his symptoms were improving, refused toenail removal, and did not return for treatment even though he was told to do so if his symptoms worsened or did not improve. [Filing No. 90-4 at 7.]

Mr. Fromer appealed the decision on October 19, 2012, reiterating his complaints. [Filing No. 90-4 at 2-3.] Corizon's Director of Health Services responded on October 29, 2012, denying the grievance and finding, among other things, that there was no evidence that a biopsy was performed while Mr. Fromer was at MCF. [Filing No. 90-4 at 4.]

### G. Mr. Fromer's Lawsuit

Mr. Fromer filed this lawsuit on February 7, 2013. He describes his case as follows:

> This is an action to redress violations of Plaintiff's rights under the 8th Amendment resulting from the Defendants' deliberate indifference to Plaintiff's medical needs and secreting from him information about his condition, an antibiotic resistant, contagious and potentially life-threatening infection known as Methicillin-resistant Staphylococcus aureus ("MRSA"). Each Defendant in one way or another was involved and participated in the Plaintiff's treatment or lack thereof. Among other issues, rather than transfer the Plaintiff to a facility equipped to handle his condition, the Defendants continued to treat the Plaintiff at ill-equipped and ill-prepared facilities with medications and treatments which failed and continued to fail.

[Filing No. 24 at 2.]

Mr. Fromer does not assert any state law claims against any Defendants, but rather only asserts an Eighth Amendment claim against each Defendant – specifically: (1) against Corizon for "creating and implementing or causing the implementation of policies, practices, procedures, and customs which result in ineffective and inadequate medical care to [Mr. Fromer]…"; (2) against Drs. Marandet and Rajoli for "not providing and/or denying [Mr. Fromer] effective and adequate medical treatment"; and (3) against Miami HSA and Putnamville HSA for "creating and implementing policies, practices, procedures, and customs which resulted in the ineffective and inadequate medical care provided to [Mr. Fromer]." [Filing No. 1 at 9-10.] He seeks compensatory and punitive damages, plus attorneys' fees and costs. [Filing No. 1 at 10-11.] Defendants have moved for summary judgment on all of Mr. Fromer's claims. [Filing No. 87.]

### III.
#### DISCUSSION

#### A.  Exhaustion of Administrative Remedies

Defendants argue that Mr. Fromer cannot pursue his claims in this litigation because he did not exhaust his administrative remedies. [Filing No. 89 at 18-20.] Specifically, they argue that his grievances do not identify or relate to Corizon, Drs. Marandet or Rajoli, or the Miami HSA or Putnamville HSA ("the HSAs"), and that Grievance 73584 does not identify which doctor it relates to. [Filing No. 89 at 19-20.]

In response, Mr. Fromer argues that the grievances and appeals were "sufficient under the requirements of the Prison Litigation Reform Act." [Filing No. 107 at 19.] Defendants do not address their exhaustion of remedies argument in their reply. [Filing No. 114.]

The substantive law applicable to the motion for summary judgment is the Prison Litigation Reform Act ("PLRA"), which requires that a prisoner exhaust his available administrative remedies before bringing a suit concerning prison conditions. 42 U.S.C. § 1997e(a); *see Porter v.*

*Nussle*, 534 U.S. 516, 524-25, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532 (citation omitted).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) (footnote omitted); *see also Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) ("In order to properly exhaust, a prisoner must submit inmate complaints and appeals 'in the place, and at the time, the prison's administrative rules require'") (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)). "In order to exhaust administrative remedies, a prisoner must take all steps prescribed by the prison's grievance system." *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004).

That said, Defendants have the burden of pleading and proving failure to exhaust administrative remedies as an affirmative defense. *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999) ("Because failure to exhaust administrative remedies is an affirmative defense, defendants have the burden of pleading and proving the defense"). When exhaustion of remedies is raised as an affirmative defense, a district court "must not proceed to render a substantive decision *until* it has first considered [exhaustion of administrative remedies under] § 1997e(a)….Defendants may waive or forfeit reliance on § 1997e(a), just as they may waive or forfeit the benefit of a statute of limitations. [But] [w]hen they assert their rights…then the judge must address the subject immediately." *Fluker v. County of Kankakee*, 741 F.3d 787, 792 (7th Cir. 2013) (emphasis in

original) (quoting *Perez v. Wisconsin Department of Corrections*, 182 F.3d 532, 536 (7th Cir. 1999)).

Here, Defendants did not raise exhaustion of administrative remedies as an affirmative defense in their Answer, [Filing No. 20 at 5-6], as they must to properly preserve that defense. Accordingly, the Court finds that Defendants have waived the argument that Mr. Fromer has failed to exhaust his administrative remedies, and the Court will not address the argument's substantive merits. *See Perez*, 182 F.3d at 536 (defendant can waive reliance on § 1997e(a)'s exhaustion of administrative remedies requirement); *Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010) ("Generally, a party must plead affirmative defenses…in its answer to properly preserve them"); *Littler v. Indiana Dept. of Corrections Com'r*, 2013 WL 1149607, *5 (N.D. Ind. 2013) (defendants did not properly preserve affirmative defense of failure to exhaust administrative remedies when they failed to specifically raise it in their answer). It is well-settled that a plaintiff cannot amend his or her complaint in response to a summary judgment motion. *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) (plaintiff "could not amend her complaint through allegations made in response to a motion for summary judgment"). Similarly, a defendant may not assert an affirmative defense in a motion for summary judgment that was not properly pled. Defendants are not entitled to summary judgment based on a failure to exhaust administrative remedies.

### B. Claim Against Corizon

Mr. Fromer alleges that Corizon violated his Eighth Amendment rights by "implementing or causing the implementation of policies, practices, procedures, and customs which result in ineffective and inadequate medical care to [Mr. Fromer and] violated [his] rights secured to him by the Eighth Amendment…." [Filing No. 1 at 9.] Defendants argue that Mr. Fromer can only assert a cognizable deliberate indifference claim against Corizon if it presents evidence that "Mr.

Fromer suffered a constitutional deprivation as the result of an express policy or custom of Corizon…." [Filing No. 89 at 31.] Defendants argue that Mr. Fromer has not presented such evidence.

Mr. Fromer responds by asserting that Corizon failed to establish and/or implement standards for the diagnosis and treatment of MRSA and staph, and that this failure "resulted in the prolonged suffering by [Mr. Fromer] and possible spreading of the condition to other parts of his body." [Filing No. 107 at 23.] Mr. Fromer also argues, however, that Corizon "had several express policies it was required to but did not follow," and that it did not give the doctors any standard procedures to follow. [Filing No. 107 at 24.] Mr. Fromer asserts that Corizon did not provide training to Drs. Marandet or Rajoli or the HSAs, that they did not see the Contract or the standards the Contract required them to follow, and that they did not "create their own diagnostic and treatment policies." [Filing No. 107 at 24.] Defendants do not address Mr. Fromer's arguments which specifically relate to his claim against Corizon in their reply. [Filing No. 114.]

Corizon has contracted with the IDOC to provide medical care to various prisons throughout Indiana. Corizon is "treated the same as a municipality for liability purposes under § 1983." *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (a corporation that contracted with a jail to provide health services is "treated the same as municipalities for liability purposes in a § 1983 action"); *see also Hahn v. Walsh*, 762 F.3d 617, 639-40 (7th Cir. 2014); *Valdez v. Corizon, Inc.*, 2014 WL 1874875, *6 (N.D. Ind. 2014) (finding prisoner could only assert § 1983 claim against Corizon for health care received at Indiana State Prison if "poor healthcare leading to the injury [was] the result of the employer entity's policy or practice"); *Heard v. Illinois Dept. of Corrections*, 2012 WL 832566, *7 (N.D. Ill. 2012). Corizon may be liable for harm to persons incarcerated "if it maintains a policy that sanctions the maintenance of prison conditions that

infringe upon the constitutional rights of the prisoners." *Minix*, 597 F.3d at 832. The "policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation, which a plaintiff may show directly by demonstrating that the policy is itself unconstitutional." *Id.* "If a plaintiff cannot identify any formal policy that is unconstitutional, the plaintiff may show deliberate indifference through a 'series of bad acts' creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Id.*

"It is well-established that there is no respondeat superior liability under § 1983." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002). A "private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Id.* "In general terms, to maintain a viable § 1983 action against a municipality or similar entity, a plaintiff must demonstrate that a constitutional deprivation occurred as a result of an express policy or custom of the government unit." *Id.* (citing *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001)).

Mr. Fromer argues that Corizon had policies in place that it was required to follow but did not, and also that it did not have a policy on the diagnosis and treatment of MRSA and staph.[13]

_____

[13] While Mr. Fromer's claim against Corizon appears to be based only upon its policies or practices, some of Mr. Fromer's arguments suggest that he may be attempting to hold Corizon liable under a theory of respondeat superior. [*See, e.g.*, Filing No. 107 at 24 (Mr. Fromer argues that "Corizon failed to provide training to either doctors…" and "[t]he doctors did not create their own diagnostic and treatment policies").] Both the United States Supreme Court and the Seventh Circuit have expressed some doubt regarding whether corporations like Corizon should be entitled to immunity from § 1983 claims that are based on a theory of respondeat superior. *See Richardson v. McKnight*, 521 U.S. 399, 400 & 410, 117 S. Ct. 2100 (1997) (noting that immunity extended to municipalities for respondeat superior-based claims was to "protect[] the public from unwarranted timidity on the part of the public officials," but this concern is not necessarily present where a private company is providing prison guards to a state correctional facility because "marketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance"); *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 794 (7th Cir. 2014) (noting that all circuits that have considered the question of whether *Monell* applies to private corporations have said yes, but stating that "a new

[Filing No. 107 at 24.]  As to Corizon's policies and practices, at most Mr. Fromer has presented

evidence that:

- Corizon's contract with the IDOC required it to comply with certain standards set forth by the ACA and the NCCHC, [Filing No. 106-5 at 2];

- The standards require that each offender with a communicable disease be provided a treatment plan, [Filing No. 106-12 at 3];

- The standards require that the provider must perform a comprehensive health appraisal within 14 days of arriving at PCF, [Filing No. 106-12 at 6];

- The Putnamville HSA did not have a policy for the course of treatment for MRSA, [Filing No. 106-3 at 8];

- PCF did not have an Infection Control Committee, as required by the IDOC Health Care Services Directives, [Filing No. 106-3 at 9]; and

- Corizon did not provide any training to Dr. Rajoli, [Filing No. 106-2 at 3].[14]

---

approach may be needed for whether corporations should be insulated from *respondeat superior* liability under § 1983" because "[s]ince prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns").  But the Supreme Court has not overturned this principle, and the Seventh Circuit has noted "[f]or now, this circuit's case law still extends *Monell* from municipalities to private corporations."  *Shields*, 746 F.3d at 795. Accordingly, any claim against Corizon based on a respondeat superior theory of liability is precluded.

[14] Mr. Fromer sets forth other factual assertions related to Corizon's policies and practices, but either does not provide citations to evidence in the record, or mischaracterizes that evidence.  For example, he asserts that "the Defendant doctors were never provided with any ACA materials," "Plaintiff Fromer was not provided with a treatment plan from Defendants Marandet, Rajoli or Corizon," and "Corizon did not require any of the other Defendants to comply with the treatment plan," but provides no citation to evidence supporting those statements.  [Filing No. 107 at 11.] He also states that "Corizon never gave the [Contract] to the PCF HSA," [Filing No. 107 at 12], but the Putnamville HSA only testified that he had not seen the Contract, [Filing No. 106-3 at 6]. Finally, Mr. Fromer states that "Corizon did not provide any training specific to infectious disease," but the deposition excerpt he cites only shows that the Putnamville HSA did not attend any training programs that were specifically about infectious disease, [Filing No. 106-3 at 37]. Stating the facts precisely is important, especially in the summary judgment context, and Mr. Fromer either has not cited support for the facts he sets forth, or the evidence he has cited does not support his assertions.  The Court need not, and will not, sift through Mr. Fromer's exhibits to find support for his claims.  *See Johnson*, 325 F.3d at 898.

Mr. Fromer is attempting to fit a square peg into a round hole. He must present evidence that Corizon had a specific policy or practice that it enforced that is unconstitutional. *Jackson*, 300 F.3d at 766. He argues that Corizon had a policy that it did not follow and should have, and that Corizon did not have a MRSA and staph policy and should have. Even if Mr. Fromer could show that Corizon had an adequate policy which Drs. Marandet and Rajoli did not follow in his case, his claim against Corizon would fail. Mr. Fromer cannot rely on the circumstances surrounding his own treatment to establish the existence of a policy or practice. *See Palmer v. Marion County, 327 F.3d 588, 597 (7th Cir. 2003)* ("a showing of isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature"). In *Palmer*, the Seventh Circuit detailed various discovery requests the plaintiff could have made to seek "raw data" to create a genuine issue of material fact as to whether the defendant had a general policy or a widespread practice of an unconstitutional nature. *Id.* Because the plaintiff in *Palmer* did not do that, the Seventh Circuit held that he could not create an issue of material fact by only pointing to his own circumstances. *Id.* A plaintiff's own circumstances "demonstrate nothing more than isolated incidents," which do "not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature." *Id.*

As for Mr. Fromer's argument that Corizon did not have a MRSA and staph treatment policy, Mr. Fromer would need to show that Corizon's treatment of him was the result of "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Valdez*, 2014 WL 1874875 at *7. In order to show that there was a widespread wrongful practice, a plaintiff must show "that the practice really was widespread, either by showing its prevalence in multiple

instances or by showing directly that it had the effect of or was acknowledged as policy…." *Id.* at *7. Mr. Fromer has only presented evidence regarding his own treatment, and has not presented any evidence that the manner in which he was treated was widespread because it was prevalent or was acknowledged as policy.

In sum, Mr. Fromer has only pointed to his own circumstances, which is not enough to create a genuine issue of material fact as to whether Corizon had a general policy or a widespread practice of an unconstitutional nature. Summary judgment is the moment where a party must show what evidence it has that would convince a trier of fact to accept its version of events, *Johnson, 325 F.3d at 901*, and Mr. Fromer has failed to present such evidence. For that reason, the Court grants summary judgment in favor of Corizon.

### C. Claims Against Miami HSA and Putnamville HSA

Defendants argue that claims against the HSAs should be dismissed because Mr. Fromer has not identified who the individual HSAs at those facilities were, or how they were personally involved in the case, and how their actions resulted in harm to Mr. Fromer. [Filing No. 89 at 28-29.] Defendants also assert that they are entitled to summary judgment on the claims against the HSAs because Mr. Fromer cannot assert § 1983 claims against the individual HSAs solely for their supervisory role, but must "establish that…the Health Service Administrators actually knew that [he] had MRSA and inferred there was a substantial risk of serious harm to [him] because it was diagnosed or treated [inappropriately]." [Filing No. 89 at 30.] Because he has not made that showing, Defendants argue, Mr. Fromer's claims against the HSAs fail.

Mr. Fromer responds that his claims against the HSAs are viable because the HSAs "are the chief on-site administrators and the liaisons between Corizon and the facility medical departments," and they "failed to implement required policies and procedures relating to infectious

diseases, MRSA and staph." [Filing No. 107 at 23.] He also asserts that his claims against the HSAs are "official capacity claims, ultimately being claims against Corizon." [Filing No. 107 at 23.] Defendants did not reply to Mr. Fromer's arguments on this issue.

On April 14, 2014, the Magistrate Judge ordered Mr. Fromer "to seek leave to amend his complaint to name individuals who are, or were, the Miami or Putnamville HSA against whom he seeks relief in their individual capacities." [Filing No. 81 at 7.][15] The Magistrate Judge also stated that "[i]f individual capacity claims are not permitted, then the allegations against the Miami and Putnamville HSAs will be deemed allegations against Corizon based on its employment of the HSAs." [Filing No. 81 at 8.] Mr. Fromer never sought to amend his Complaint to name the individual HSAs so, consistent with the Magistrate Judge's Order, his claims against the HSAs are deemed claims against Corizon arising from its employment of the HSAs. [*See* Filing 81 at 8.]

As discussed above, Mr. Fromer cannot assert a § 1983 claim against Corizon based on a respondeat superior theory of liability. *See Jackson*, 300 F.3d at 766. Additionally, any claim against Corizon based on its policies and procedures fails because, as discussed above, Mr. Fromer has not pointed to evidence supporting such a claim. The Court grants summary judgment in favor of Miami HSA and Putnamville HSA on Mr. Fromer's claims against them, which are deemed claims against Corizon.

### D. Claims Against Drs. Marandet and Rajoli

Mr. Fromer's § 1983 claims against Dr. Marandet and Dr. Rajoli remain for the Court to consider. The Eighth Amendment bans "cruel and unusual punishments" and "requires prison officials to take reasonable measures to guarantee the safety of inmates, including the provision of adequate medical care." *Minix*, 597 F.3d at 830. A cause of action may be brought under 42

---

[15] During the course of discovery, Mr. Fromer learned the identities of the HSAs.

U.S.C. § 1983 against "[e]very person who, under color of statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

To sustain a § 1983 claim for violation of the right to adequate medical care, a plaintiff must show that: (1) he had an objectively serious medical condition; (2) the defendants knew of the condition and were deliberately indifferent to treating him; and (3) this indifference caused him some injury. _Gayton v. McCoy_, 593 F.3d 610, 620 (7th Cir. 2010). With regard to the deliberate indifference element, the plaintiff must show that the official "acted with the requisite culpable state of mind." _Id._ This element has two components – (1) the official must have subjective knowledge of the risk to the inmate's health, and (2) the official also must disregard that risk. _Id._ In sum, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." _Id._ A defendant who recognizes the substantial risk is not liable, though, if he "responded reasonably to the risk, even if the harm ultimately was not averted." _Id._

"A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation." _Garvin v. Armstrong_, 236 F.3d 896, 898 (7th Cir. 2001). Neither negligence nor even gross negligence constitutes deliberate indifference. _Perkins v. Lawson_, 312 F.3d 872, 875 (7th Cir. 2002); _see also Thompson v. Godinez_, 561 Fed. Appx. 515, 518 (7th Cir. 2014) ("Deliberate indifference is conduct that is intentional or reckless and not simply negligent").

In order to survive summary judgment on a § 1983 claim, a plaintiff "must produce evidence that the defendant 'caused or participated in [the] constitutional deprivation.'" _Delapaz_

*v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). Plaintiff may not rely on the doctrine of respondeat superior but must instead allege personal involvement in the wrongdoing. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). A medical director sued under § 1983 "cannot be liable absent personal involvement." *Smith v. Rohana*, 433 Fed. App'x. 466, 469 (7th Cir. 2011). Instead, "[t]here must be a causal connection or affirmative link between the action complained about and the official sued." *Arnett v. Webster*, 658 F.3d 742, 759 (7th Cir. 2011).

Mr. Fromer has clarified that he is not asserting claims relating to any foot conditions other than MRSA and staph, [Filing No. 107 at 19], and Defendants do not dispute that MRSA and staph are serious medical conditions, [Filing No. 89 at 3; Filing No. 89 at 21-28.] Accordingly, the Court proceeds to consider whether Dr. Marandet or Dr. Rajoli were deliberately indifferent in treating Mr. Fromer's MRSA and staph.

### 1. *Dr. Marandet*

Defendants argue that Dr. Marandet responded each time Mr. Fromer presented for treatment, and exercised his medical judgment "within the appropriate standard of care that was appropriate under the circumstances." [Filing No. 89 at 24.] Defendants note that Dr. Marandet provided "pain medication, antifungal medication, antibiotic medication, anti inflammatory medication, topical creams and powder, and foot soakings to treat [Mr. Fromer's] various presentations from athlete's foot and a staph infection to a MRSA infection that was resistant to methicillin and therefore required treatment with an antibiotic that was not resistant to the infection, such as Bactrim DS." [Filing No. 89 at 25.] Defendants also argue that Dr. Marandet "never knew of a MRSA infection that [Mr. Fromer] had that [he] did not treat," and that the MRSA infection cleared up after Mr. Fromer took the Bactrim prescribed by Dr. Marandet. [Filing

No. 89 at 26-27.]  In support of their motion, Defendants submit Dr. Marandet's Certification in which he outlines the medical care he provided to Mr. Fromer and states, among other things, that: (1) he only observed Mr. Fromer with a MRSA infection once, in June 2012; (2) when he observed the MRSA infection, he prescribed Bactrim DS which was "consistent with [his] medical judgment and [his] understanding of the appropriate medical standard of practice and care concerning treatment of a MRSA infection that is sensitive to Trimethoprim/Sulfamethocazole pursuant to lab testing"; (3) at all times, he treated Mr. Fromer's foot conditions consistent with his medical judgment and his "understanding of the appropriate medical standard of practice and care under the circumstances"; and (4) he "did not consciously disregard [Mr. Fromer's] foot condition(s), [or] his MRSA infection in June 2012…." [Filing No. 90-2 at 5-6.]

Mr. Fromer responds that "[Dr.] Marandet was deliberately indifferent in failing to order a diagnostic test for Fromer for thirteen months and for prescribing the same ineffective line of treatment, which resulted in unnecessary pain and the possible spreading of the infection." [Filing No. 107 at 21.]  In support, Mr. Fromer submits an expert report from Dr. Alexander Stemer. However, Dr. Stemer does not specifically refer to Dr. Marandet, but only opines generally that: (1) Mr. Fromer "experienced fractured care, with multiple providers entering formulaic notes, repetitive treatments and often identical unsuccessful regimens," and "[t]here appeared to be indifference on the part of the providers to assimilate the medical record into a coherent document"; (2) Mr. Fromer was treated "for nearly four years (9/17/08-6/15/12) before a simple wound culture was obtained" which confirmed MRSA, and MRSA "was almost certainly the pathogen for the previous 47 months"; (3) Mr. Fromer's "repeated clinical failures were never analyzed to determine the cause of repeated ineffective therapy"; (4) "[m]ultiple medications and treatments were prescribed which actually worsen infection, including repeated courses of topical

corticosteroid medications"; (5) Mr. Fromer "was never offered decolonization" and "[h]is environment was not analyzed to determine if there was an environmental source"; (6) the medical record has "no documentation of compliance"; (7) courses of antibiotics were typically short between repeated courses of therapy; (8) two conditions Mr. Fromer had – chronic fungal infection of the skin and ingrown toenails – can be associated with treatment failure of MRSA, and neither was adequately treated; and (9) newer and better therapy was not offered. [Filing No. 106-14 at 3-5.] Dr. Stemer goes on to state how he would have treated Mr. Fromer, including performing repeated cultures and prescribing terbinafine therapy. [Filing No. 106-14 at 5-6.] He also opines that Keflex "cannot be effective" against MRSA. [Filing No. 106-14 at 6.]

On reply, Defendants rely upon the expert reports of Dr. John Bonema and Dr. Michael McIlroy.[16] Dr. Bonema outlines the treatment Dr. Marandet provided to Mr. Fromer, and opines that Mr. Fromer did not exhibit clinical symptoms or lab results that warranted treatment different than what he received for his various medical conditions. [Filing No. 115-1 at 8.] Dr. Bonema notes that MRSA usually looks like a staph infection, and that Bactrim or Bactrim DS is usually the first line of treatment for MRSA. [Filing No. 115-1 at 8-9.] Dr. Bonema also states that "[t]he primary source of Mr. Fromer's foot discomfort and infection appears to be ingrown toenails which he refused to have treated by having the ingrown portions removed on numerous occasions." [Filing No. 115-1 at 9.] Dr. Bonema disputes Dr. Stemer's expert report, stating that there is no evidence Mr. Fromer received fractured care, it is speculation and very unlikely that MRSA caused

---

[16] The Court would generally frown upon Defendants' reliance on expert reports for the first time on reply. However, the timing of the disclosure of expert reports was complicated in this case due to unique circumstances. Without belaboring the chronology of events, nor determining whether supplemental expert reports submitted by Mr. Fromer and Defendants are truly "supplemental" under Fed. R. Civ. P. 26, the Court finds it equitable and appropriate to consider all expert reports submitted by Mr. Fromer and Defendants.

Mr. Fromer's other skin issues during his incarceration, frequent cultures of Mr. Fromer's issues were not necessary, the majority of Mr. Fromer's skin problems did not require antibiotic treatment, there is no evidence that certain treatments Mr. Fromer was given worsened his condition, and there was no need for decolonization or an analysis of Mr. Fromer's environment because there was not an "outbreak" of MRSA. [Filing No. 115-2 at 3-5.] Dr. McIlroy expresses many of the same opinions as Dr. Bonema, but also adds that MRSA does not cause "chronic pain syndrome," as Dr. Stemer claimed. [Filing No. 115-3; Filing No. 115-4 at 4.] Defendants also argue that "a difference of opinion between a physician and a patient does not give rise to a constitutional right, nor does it state a cause of action under § 1983." [Filing No. 114 at 3.]

Mr. Fromer filed a surreply, and submitted a supplemental report from Dr. Stemer in which he disputes the points in Dr. Bonema's expert report. He mentions Dr. Marandet by name only once, to note that Dr. Marandet was the first to document "bilateral toe infections secondary to ingrown toenail." [Filing No. 122-2 at 2.] He does not mention Dr. Marandet again. Dr. Stemer opines that:

- Almost none of the medical records reflect an objective physical examination;

- Only a few of the medical records note that Mr. Fromer had an ingrown toenail;

- Mr. Fromer was seen on multiple occasions by a licensed practical nurse, "[t]here is a lapse of days to months until seen by a physician," and in some instances the scope of service provided by the licensed practical nurse "exceed[ed] that which is customarily within the legitimate duties and training" of a licensed practical nurse;

- Because Mr. Fromer showed signs of infection multiple times, he should have received cultures in order to determine proper treatment;

- Mr. Fromer's ingrown toenail could have been treated by teaching him to properly trim his nails and offering him well-fitting shoes or cotton wedging and foot soaks – none was done here, and nail removal is generally reserved for situations where these other treatments are unsuccessful;

- Patients with a relapse of staph or MRSA are generally treated with longer courses of antibiotics and decolonization;

- Signs of infection were seen in toes that did not have ingrown nails, so the MRSA was not caused by his "failure to accept the recommendation that his toenail be removed before more moderate forms of therapy including properly fitting shoes were offered";

- Mr. Fromer's skin infection was not routine because he had sought treatment multiple times, and "the jail environment is not a routine environment"; and

- "[A]ny repeated insult to injury can sensitize the peripheral nerve and continuous pain may in fact sensitize the central nervous system causing a chronic pain syndrome."

[Filing No. 122-2 at 2-6.] Dr. Stemer concludes that "I believe it is more medically likely than not that appropriate evaluation and treatment of Mr. Fromer would have resolved his problems without the residual effects he continues to experience." [Filing No. 122-2 at 6.]

Dr. Marandet's treatment of Mr. Fromer spanned approximately a fifteen-month period, from March 24, 2011 to June 15, 2012. Within those fifteen months, Mr. Fromer presented to the health care facility seventeen times for foot issues, and it appears that Dr. Marandet treated him ten of those times. Dr. Marandet's treatment of Mr. Fromer began with Dakin's solution for what Dr. Marandet believed was "surinfected athlete's foot," or a fungal infection. [Filing No. 90-1 at 16.] Dr. Marandet encountered Mr. Fromer nearly two months later, when he noted that Mr. Fromer's foot looked much better with the oral antibiotic he had been taking. [Filing No. 90-1 at 18.] A month after that, Dr. Marandet prescribed Dakin's solution and Bactrim DS, which Mr. Fromer's expert acknowledges would have been effective against MRSA. [See Filing No. 90-1 at 21; Filing No. 106-14 at 3.] Dr. Marandet again prescribed Bactrim DS, along with other medications, approximately six weeks later when Mr. Fromer came in for "surinfected tinea pedia." [Filing No. 90-1 at 23.]

Dr. Marandet again noted signs of infection on October 4, 2011, when he stated that Mr. Fromer had an "[i]ngrowing nail…infected," prescribed Keflex, and requested that Mr. Fromer be scheduled for removal of his toenails. [Filing No. 90-1 at 26.] Keflex was prescribed at least four more times between December 2011 and May 2012. [See Filing 90-1 at 27-39.] During that time, the medical records reflect that Dr. Marandet noted that "Keflex has worked well in the past," [Filing No. 90-1 at 30], and that Mr. Fromer specifically requested Keflex, [Filing No. 90-1 at 31-32]. Other health care providers noted signs of infection on December 4, 2011, [Filing No. 90-1 at 29], March 1, 2012, [Filing No. 90-1 at 31-32], and March 17, 2012, [Filing No. 90-1 at 34]. On March 27, 2012, Dr. Marandet saw Mr. Fromer for "recurrent tinea pedis," and prescribed Mycostatin powder. [Filing No. 901- at 35-36.] Nearly a month later, Mr. Fromer presented again with foot pain and redness, but stated "powder has worked the best and keeps feet comfortable." [Filing No. 90-1 at 37.] Mr. Fromer again reported improvement on Keflex on May 31, 2012, but Dr. Haynes noted that if drainage occurs again he should have a culture. [Filing No. 90-1 at 40.] When drainage started ten days later, a culture was taken which revealed MRSA. [Filing No. 90-1 at 46-49.] Dr. Marandet prescribed Bactrim DS based on the culture report, and Mr. Fromer tested negative for MRSA after he was transferred to PCF. [Filing No. 90-1 at 49; Filing No. 90-1 at 83.]

Mr. Fromer received treatment for foot issues for fifteen months, and his infection was only cultured after a different doctor (Dr. Haynes) stepped in and ordered it. At first glance, this long period of treatment, and the fact that Dr. Marandet himself never ordered a culture, may seem to support a deliberate indifference claim. *Myrick v. Anglin*, 496 Fed. Appx. 670, 674 (7th Cir. 2012) ("Delaying treatment may constitute deliberate indifference if the delay exacerbates the injury or unnecessarily prolongs an inmate's pain") (citing *Estelle v. Gamble*, 429 U.S. 97, 104-

05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). However, here Dr. Marandet did not delay treatment at all.  He provided it, though the condition recurred or persisted.  Mr. Fromer has not presented any specific evidence which indicates that Dr. Marandet himself acted with deliberate indifference.

In order for Dr. Marandet to be held liable under § 1983, Mr. Fromer must present evidence that Dr. Marandet was personally involved in the constitutional violation.  *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001).  Mr. Fromer fails to connect his allegations of deliberate indifference specifically to Dr. Marandet.[17]  Mr. Fromer relies upon the expert opinions of Dr. Stemer, but his reports do not support a claim of deliberate indifference against Dr. Marandet.

The most glaring problem with Mr. Fromer's reliance on Dr. Stemer's expert reports is that they do not address Dr. Marandet specifically – save for one reference in Dr. Stemer's supplemental report to Dr. Marandet being the first medical professional to note "bilateral toe infections secondary to ingrown toenail." [Filing No. 122-2 at 2.] Indeed, Dr. Stemer stated in his deposition that he focused on a 47-month period during which Mr. Fromer sought treatment, [Filing No. 122-1 at 3], even though Dr. Marandet did not treat Mr. Fromer during the first two years of that period.  Dr. Stemer's expert reports are not specific in terms of which time period within the 47 months he is referring to and do not criticize any care provided specifically by Dr. Marandet.  Also, Dr. Stemer states that Mr. Fromer "suffered fractured care with a failure of his providers to recognize that he was simply prescribed repetitive courses of treatment shown to be

---

[17] Mr. Fromer could also meet the "personal involvement" requirement if he showed that the deliberate indifference occurred "at [Dr. Marandet's] direction or with [his] knowledge and consent." *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994) (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985)).  But Mr. Fromer does not tie his deliberate indifference allegations to Dr. Marandet's role as Medical Director at MCF.

ineffective on previous visits." [Filing No. 106-14.] This seems to go against a theory that Dr. Marandet acted with deliberate indifference, and is more a criticism of Corizon. And Dr. Stemer does not say at what point a culture should have been ordered or that Dr. Marandet should have ordered that culture,[18] only stating that he would have prescribed "terbinafine therapy" after topical antifungal medications did not work, [Filing No. 106-14 at 6], and that when infection is observed multiple times, a culture is necessary if "treatment may be different dependent upon the conclusion," [Filing No. 122-2 at 3].

Additionally, while "healthcare staff [may not] persist with treatment they know to be ineffective when reasonable alternatives are available," *Myrick*, 496 Fed. Appx. at 674-75, Mr. Fromer has not presented any evidence that Dr. Marandet himself acted in any other manner besides exercising his good faith medical judgment in treating Mr. Fromer – for example, that he knew Keflex was ineffective but kept prescribing it anyway. *See Wooler v. Hickman County, Ky.*, 2010 WL 1948356 (6th Cir. 2010) (affirming grant of summary judgment in favor of medical provider where prisoner had several staph infections over a nine month period and claimed doctor should have cultured for MRSA; court found that doctor's prescription of Keflex reflected his "good-faith belief that Keflex was appropriate treatment for [plaintiff's] infections"). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence

---

[18] To the extent Mr. Fromer bases his claims against Dr. Marandet on his belief that a culture should have been obtained earlier, "the question whether…additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment," and "does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107. *See also McCluskey*, 505 Fed. Appx. at 203 ("There is no evidence the decision not to order an immediate biopsy or dermatology consultation was made with deliberate indifference to [plaintiff's] condition or was based on anything other than medical judgment. At best, [plaintiff] has presented evidence of a misdiagnosis and possible medical malpractice, and this is insufficient….Importantly, there is no evidence any of the Medical Defendants intended to cause him pain or were deliberately indifferent to his pain").

it has that would convince a trier of fact to accept its version of events." *Johnson*, 325 F.3d at 901. Mr. Fromer's failure to present evidence specifically showing what Dr. Marandet did that constituted deliberate indifference is fatal to his claim against Dr. Marandet.[19]

Further, the time frame does not necessarily support a deliberate indifference claim when it is viewed in detail. For example, Mr. Fromer was taking Bactrim DS (prescribed at least twice by Dr. Marandet) for several months before he was prescribed Keflex, but Dr. Stemer asserts that Bactrim is appropriate treatment for MRSA.[20] Additionally, though Dr. Stemer insinuates that prescribing Keflex was inappropriate, the medical records indicate that Mr. Fromer specifically requested Keflex on at least one occasion during the time period that he was receiving it repeatedly. [Filing No. 90-1 at 31-32.] Finally, the medical records indicate there may have been issues with Mr. Fromer complying with his treatment plan. [*See, e.g.,* Filing No. 90-1 at 29 (noting that Mr. Fromer "needed to start coming for those foot soaks and he would notice a difference").]

Mr. Fromer has not presented evidence sufficient to show that Dr. Marandet was personally deliberately indifferent to his medical treatment. His claims of "fractured care" and Dr. Stemer's general opinions regarding his four years of treatment fall well short of the evidence Mr. Fromer would need to present to succeed on his claim against Dr. Marandet. Accordingly, that claim fails.

---

[19] Additionally, even if Dr. Stemer had specifically criticized Dr. Marandet's treatment, his expert opinion appears to simply present a difference of opinion as to the treatment Mr. Fromer received, which is not sufficient to establish deliberate indifference. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (stating "a difference of opinion among physicians on how an inmate should be treated cannot support a finding of deliberate indifference" and "[t]o infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment"); *Alexander v. Kenworthy*, 2014 WL 773480, *4 (E.D. N.C. 2014) ("At most, plaintiff alleges a disagreement regarding the appropriate form of treatment for his MRSA infection, which is insufficient to state a claim for deliberate indifference").

[20] Bactrim "DS" is simply Bactrim "double strength." http://www.drugs.com/pro/bactrim-ds.htlm (last visited October 2, 2014).

## 2. *Dr. Rajoli*

Defendants set forth the same arguments relating to Dr. Rajoli's treatment of Mr. Fromer as they do for Dr. Marandet. [Filing No. 89 at 24-28.] They submit Dr. Rajoli's Certification, in which he outlines the care he provided to Mr. Fromer and states that he treated Mr. Fromer "consistent with [his] medical judgment and [his] understanding of the appropriate medical standard of practice and care under the circumstances." [Filing No. 90-3 at 6.]

Mr. Fromer asserts the same arguments in response and relies on the same general opinions of Dr. Stemer (who does not refer specifically to Dr. Rajoli). Mr. Fromer adds, however, that Dr. Rajoli prescribed Bactrim when Mr. Fromer arrived at PCF even though the records indicated that Bactrim "had not been effective in permanently defeating the symptoms or infection." [Filing No. 107 at 21.] He also argues that Dr. Rajoli "never treated [him] for MRSA," gave conflicting accounts regarding a biopsy of an abscess on Mr. Fromer's foot, and "failed to provide adequate diagnostic testing." [Filing No. 107 at 22.] On reply, Defendants rely on the expert reports from Drs. Bonema and McIlroy and note that Dr. Rajoli has attested that he believed his actions were in accordance with his medical judgment and applicable standards of care under the circumstances. [Filing No. 114 at 2.] Mr. Fromer again relies upon Dr. Stemer's supplemental report on surreply, which does not mention Dr. Rajoli by name.

Mr. Fromer's claim against Dr. Rajoli fails for the same reasons his claim against Dr. Marandet fails. Mr. Fromer has not put forth any evidence indicating that Dr. Rajoli, specifically, treated him with deliberate indifference. Dr. Stemer does not mention Dr. Rajoli by name in either of his reports or tie any conduct to Dr. Rajoli, which is fatal to Mr. Fromer's claim against him. *See Sanvill*e, 266 F.3d at 734.

The timeline also does not provide any indication that Dr. Rajoli acted with deliberate indifference. Dr. Rajoli treated Mr. Fromer for approximately three months, seeing him five times. At his initial visit with Dr. Rajoli on September 21, 2012, Dr. Rajoli explained to Mr. Fromer that his ingrown toenail should be removed but Mr. Fromer said his symptoms had improved and he refused to have the removal procedure. [Filing No. 90-1 at 72-75.] When Mr. Fromer came in a month later with lesions and itching, Dr. Rajoli scheduled a "punch biopsy." [Filing No. 90-1 at 79-81.] At the biopsy, Dr. Rajoli noted that "the foot condition healed to the extent there was nothing to perform a biopsy of," but swabbed the foot area for a culture that came back negative for MRSA but positive for staph. [Filing No. 90-1 at 82-83.] Dr. Rajoli prescribed Bactrim to be given by prison staff, because "[c]ompliance with meds has been an issue." [Filing No. 90-1 at 84-86.] Nearly a month later, Mr. Fromer was scheduled for an appointment but did not show up. [Filing No. 90-1 at 89.] At the re-scheduled appointment, Dr. Rajoli examined Mr. Fromer for pain while walking, noted that he had plantar fasciitis, and diagnosed him with a foot sprain. [Filing No. 90-1 at 91-93.] At his last encounter with Mr. Fromer a few weeks later, Dr. Rajoli examined him for an ingrown toenail and offered to remove the toenail, but Mr. Fromer declined. [Filing No. 90-1 at 96-101.] Dr. Rajoli prescribed Bacitracin, along with Bactrim DS which Mr. Fromer was already taking. [Filing No. 90-1 at 96-101.]

The Court does not find any evidence, either in the record or in Dr. Stemer's expert reports, indicating that Dr. Rajoli acted in a deliberately indifferent manner. To the contrary, he treated Mr. Fromer every time he presented to him for treatment, took a culture of his foot on the third visit after his initial visit with Dr. Rajoli (and after only one visit where signs of infection were present, [Filing No. 90-1 at 79-81]), and treated Mr. Fromer's staph infection and ingrown toenail for which Mr. Fromer did not seek treatment again while at PCF. Mr. Fromer's main argument

that is specific to Dr. Rajoli is that his biopsy of Mr. Fromer's foot wound could not have been adequate to detect MRSA because Dr. Rajoli had noted that the wounds had "temporarily abated" and performed only a swab culture instead. [Filing No. 107 at 15.] But Mr. Fromer cites no evidence to support his assertion that "Dr. Rajoli could not have taken an adequate sample via swab culture to test if [Mr. Fromer] didn't have an open wound so that result is inconclusive as to the Plaintiff's MRSA status." [Filing No. 107 at 15.]

Mr. Fromer's deliberate indifference claim against Dr. Rajoli – based on a failure to test for and treat MRSA – fails as a matter of law. *See* *Estelle*, 429 U.S. at 106 ("the question whether…additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment," and "does not represent cruel and unusual punishment"); *McCluskey*, 505 Fed. Appx. at 203 ("There is no evidence the decision not to order an immediate biopsy or dermatology consultation was made with deliberate indifference to [plaintiff's] condition or was based on anything other than medical judgment"). There simply is no evidence that Dr. Rajoli acted with deliberate indifference to Mr. Fromer's condition, and the Court grants summary judgment in Dr. Rajoli's favor.

## IV.
### CONCLUSION

In sum, the Court finds that Defendants have waived their argument that Mr. Fromer failed to exhaust his administrative remedies, but also finds that: (1) Mr. Fromer's claim against Corizon fails because Mr. Fromer has not put forth evidence showing that Corizon's policies or practices caused a violation of Mr. Fromer's constitutional rights; (2) Mr. Fromer's claims against the HSAs fail because he has not named those individuals so claims against those individuals are considered claims against Corizon, which fail; and (3) Mr. Fromer's claims against Dr. Marandet and Dr.

Rajoli fail because he has not presented evidence that they acted with deliberate indifference toward his medical condition.

Accordingly, the Court **GRANTS** Defendants' Motion for Judgment on the Pleadings and/or Motion for Summary Judgment, [Filing No. 87]. Final judgment shall issue accordingly.

.

10/15/2014

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**